May I please the Court, Peter Abrahams for Appellant, Westport Insurance Company. I'd like to reserve five minutes for rebuttal. I want to discuss three issues today. The briefs are fairly lengthy, but in my limited time I'd like to discuss three issues. First is whether or not the exclusion in the policy for any claim alleging unfair unjust enrichment, a profit or advantage to which the insurer is not entitled, requires any duty to defend or indemnify. The second issue I'd like to address is whether the trial court erred in awarding extra contractual damages, even though that would be moot if the Court agrees with my first position. And the third issue is whether the trial court erred in awarding attorney's fees incurred by Research Corporation before it tendered the defense of the underlying lawsuit to Westport Insurance Company. Now, the reason I want to discuss the unjust enrichment exclusion is that I think there's no dispute, as I see it in the other side's briefs, that every count in the underlying lawsuit by Johnson Matthey certainly alleged that Research Corporation had received money to which it was not entitled or it had not turned over money that it was required to turn over. If that's true, if your interpretation of this clause is accurate, isn't there some force to the district court's conclusion that this is a loose recovery? No, I don't believe so, Your Honor. What would it cover? I mean, if you say it's a wrongful recovery of money, it means that that's an unjust enrichment. It's hard for me to see what this, what acts you would provide coverage for. Well, the coverage provides, certainly provides coverage for a broad array of employment claims. I'm sorry. You've got to speak a little smaller. I'm sorry. You might raise your microphone just a bit if you can. How's that? That's better, yes. Thank you. The policy covers a broad array of employment claims such as discrimination, harassment, wrongful termination. It also requires the insurance company to defend the claims of fraud if they don't come within an exclusion. I think, actually the — Well, isn't there fraud in this? Yes, but the exclusion applies here. And why wasn't that something you should defend and indemnify for? Well, I believe that the exclusion really goes to the heart and the nature of what insurance is for. No, no. Answer that question. Well, that's what I'm trying to do. You insure it for fraud. Yes. And they charge fraud. Why weren't you liable to defend and indemnify? Because there's a specific exclusion that takes away the coverage provided by the coverage clause. No, the explicit exclusion on fraud is after a judgment by a court. No. I'm asking you about fraud, naked fraud, not just charge, not determinant. This policy, like every other policy, has — and I hope I answer your question by the time I get to it, get around to it. Well, you haven't. You started out saying this wasn't an illusory thing. No, yes. And it covers wrongs. Yes. And then I say, well, how about fraud? And what do you say to that? It covers any type of fraud that doesn't come within the — Right. It covers fraud unless the fraud results in somebody getting money. That's what you're saying. And what other kind of fraud is there, basically? Well, you could have fraud that damages somebody, such as, for instance, defrauding somebody into quitting a job and giving up a valuable position. Is this an employment practice that you're talking about? That would be an employment practice. Does fraud refer to an employment practice? Is that your serious argument? Pardon? Excuse me, Your Honor. Are you seriously making that argument? I'm sorry. I didn't quite catch it. Are you seriously saying the fraud thing has to do with employment? That would be covered, yes. Explain, Your Honor. Spell that out a little bit. How would there be a fraud claim in relation to employment? Well, it would be, for example, inducing somebody to give up a job and take a — and go to work for a research corporation. Spell it out slowly, please. What is it? Say it out so I can hear it. Okay. Inducing somebody to give up a valuable position and go to work for a research corporation. So the person — Would that be a fraud? Yeah. Well, that — I think there would be some kind of an unlawful inducement or something. Well, it could be — Explain how fraud would arise in an employment context. Give me one example. Well, misrepresenting the circumstances of the employment, for one thing. What? Misrepresenting the circumstances of the employment. Misrepresenting that the company is profitable and that someone has a long-term chance to work at that company. The point I want to make is that — The point I — Yes. The real purpose of this exclusion really goes to the fundamental basis for insurance, because insurance exists to protect you against liability if you take action that injures somebody, such as — That's right, unless the injury results in economic damages. That's basically what you're saying. Well — In other words, if the net result is that you gain an advantage over anybody, which is one of the elements of fraud, that your exclusion takes away coverage for that. So, again, it seems to me that there's some force to the district court argument that you're providing illusory coverage if that's a proper interpretation of the exclusion. Fraud is just one thing that's covered unless it comes around the exclusion. I gave you an example of a fraud that wouldn't be an unjust enrichment to the insured. The fundamental point here is that insurance protects you if you engage in conduct that injures somebody. You hit somebody with your car — You know, I'd like to hear your argument, but I can't quite hear it. I'm sorry. I mean, you're speaking to the microphone. I'm trying to. Speak more slowly. I will. Speak more loudly. I will try slowly. That's good. Thank you. I just — I hear it echoing to me now. The point of insurance is to protect you if you incur liability to somebody because you engage in some wrongful conduct, such as you hit them with your car, you defame them, you invade their privacy, that sort of thing. The purpose of insurance is not to allow you to gain a net gain by your tortious conduct because that really creates a moral hazard. And that's exactly why this exclusion is in the policy, to prevent the insured from engaging in a net gain, obtaining, in this case, loyalties which allegedly it is not entitled to. And instead of having to return that money, simply having the insurance company pay for it. All right. Now, let's — let me switch topics and just talk about the duty to defend, which we know is broader than the duty to indemnify. Yes. The complaint alleges — the complaint at issue alleges breach of fiduciary duty, which is by itself covered by the policy, right? Well, unless it comes within the exclusion. Well — Yes. You know, except but for the exclusion. Yes. I mean, before we get there, that's covered by the policy. Yes. Right? And so you're supposed to defend, you're obligated to defend the contract, any suit, even if it's groundless, fraudulent, and so forth. Now, they denied that they owed the money. They denied unjust enrichment. Why aren't you required to defend that? Because the exclusion specifically said any lawsuit alleging wrongful unjust enrichment, unfair profit or advantage. And the duty to defend only goes to claims which, if proven, would result in a judgment that would be covered by the policy. There's no question but that if — although it's true that Research Corporation denied the allegations, the fact is that the only way it's going to be held liable is if, in fact, Johnson Matthey and the underlying lawsuit is able to prove what it alleged. And in that case, there would be no covered damages because it would all fall within the exclusion. Well, as I read the contract, you agree to defend against all allegations. You don't make it an exception as to allegations. No, that's not true, Your Honor. And the exclusion specifically says this policy does not apply to claims alleging unjust enrichment, profit or advantage to which the insured — But these didn't allege unjust enrichment. They allege fraud. They allege. That's what you're going to have to defend against. It may turn out to be unjust enrichment, in which case you may be off the hook. You can't in advance tell what it's going to be. Well, the only thing that could be, because that's the only thing alleged in the complaint, is that the fraud resulted in an unjust enrichment, an unfair profit to which the insured was not entitled. So by definition, if the — if Johnson Matthey were to recover a judgment, it would be a judgment that included solely damages of which are not part of the policy, as the policy specifically states. So — Well, the complaint alleged not only — only asked for getting the money back, but it asked for compensatory damages, interest punitive damages and other relief. Well, punitive damages are never covered. Right. But you've got compensatory damages that are unstated. Well, I think the complaint is quite clear. The damages are that Research Corporation allegedly was not paying royalties that it was required to pay under the contract and that it was obtaining royalties for technical information relating to carboplatinum. But how do you know on the basis of the complaint that that's all that there is to the compensatory damage claim? You don't. I think the complaint was fairly — very specific, Your Honor. No. The complaint asked for — you're talking about damages. They talk about returning money. That's to be sure. And it has a claim for unjust enrichment. But then it has a generic claim for damages. Now, you can — you may — it may be a plausible interpretation to say, well, they haven't alleged any damages other than unjust enrichment, but I can't tell that from the face of the complaint. How do you know that? Well, that's the only way that Johnson Matthey could have been damaged. It didn't receive the monies that it claimed it was entitled to. But how do you know that in terms of their allegations? Because they can allege — they can allege compensatory damages. And even though you don't think they're entitled to it, you don't think that they've — they can get recovery beyond the money of the royalties, that's still something you have to defend, because it doesn't matter if it's frivolous or groundless. If that's alleged against your insurer, you have to defend it, don't you? Well, it's our position, Your Honor, that the complaint is quite clear that it's all about the failure to pay royalties and the — Well, you gave yourself a kind of a pass. I'd like to ask you about the indemnity now. Yes. There's a settlement. Do we know what portion of the settlement went to which claim? We don't know that, Your Honor. We don't know which one of these claims was settled, and so we can't — they may have all gone for the fraud claim. Well, our position is that — well, the amount of the settlement, which I believe was $29 million, precisely reflected the amount that Research Corporation — No, the original claim was something like $400 million plus $200 million. It's a huge claim, $600 million. It's settled in this small percentage. I certainly have no idea, and I don't think it's in the record, though, if you can point it out, how the claims were settled. Well, it was a — What kind of claims were allocated? It was a compromise. It was not allocated, Your Honor. Our point simply goes back to what — the way we read the complaint and the way we read the policy, that the complaints — none of the causes of action in the complaint asserted claims for cover damages. If the Court disagrees with me, I would like to address in my brief time on the bad faith, the extra-contractual claim, where it — No. We're not — we're asking questions. We haven't — we aren't — Pardon? We're just asking questions. Yes. We haven't reached any conclusions yet. Well, I know. I just wanted to get to the bad faith issue during the time that I have remaining, because as you know, the district court in this case, although there was no cause of action pled for extra-contractual damages, and in fact, Westport filed a motion in limine prior to trial to preclude any claim for extra-contractual damages, counsel for Westport objected to any claim for extra-contractual damages in opening statement and in closing argument, and when the district court announced its intended decision in which he stated that he was going to award the entire amount of the judgment that Research Corporation Technologies obtained against Research Corporation, counsel stated, well, then I assume Your Honor has denied my motion in limine, and the district court said yes, because that faith was asserted in the pretrial order. The problem is there was no pretrial order. The district court had waived a pretrial order. So then when he so the district court's conclusion that he could award extra-contractual damages was based on a misstatement of the state of the record. So he gave the task to counsel for Research Corporation to come up with a justification and propose findings to support an award of extra-contractual damages, and I don't think any of the bases that were found their way into the final findings would support that, because the first ground was that somehow or other. So your basic argument is you were surprised that you're not entitled to, they weren't entitled to raise it that late in the game? Our basic argument is that we didn't. So let me ask you that. If you take that, why should we entertain your new basis for denial and appeal that the breach of contract is not covered? Excuse me, Your Honor? If we accept as true or accept as valid your assertion that one ought not to be able to inject an issue late in the game, why should we consider the arguments you raised for the first time on appeal that weren't presented at the district court? Well, it's our position that we did properly raise them in opening statement and in objections to my basis. You mean when you read the reservation of rights letter? Pardon me? When you're in the opening statement, when you just read the reservation of rights letter? Well, it was also objected to in a specific objection to the proposed findings that the breach of contract provision was cited in that context as well. So we think it was raised. But in any event. Well, it seems to me we have to treat them both consistently. Either we allow you to argue this on appeal and then consider the extra contractual damages as part of a valid part of the lawsuit or throw them both out. Well, I think you probably should throw out the extra contractual damages. If you disagree with our position on breach of contract, I think the same analysis goes to the extra contractual damages. We certainly didn't try it by consent. Certainly objecting to the research corporation's motion to continue the trial, the district court apparently stated in its findings that that amounted to a consent to try the extra contractual claim. I think it was exactly the opposite. We objected because. I understand. In brief time, let me ask you one more question. It's hard for me to see how you weren't on notice that extra contractual damages were part of the case. I mean, when somebody asks for a policy, makes a policy limits demand, I mean, it's obvious that red flags should go off, that extra contractual damages are going to be at issue. And then they write you about it. What prejudice would you have suffered? You were of clear notice that there were damages above policy limits. You had a policy limits demand. Can you explain to me why you don't think you were on notice? Well, the mere fact that counsel for opposing parties states that he's going to assert such a claim, I don't believe is adequate notice under the Federal rules if there's no amendment. Otherwise, we could dispense with pleadings completely. As I read this Court's cases, the requirement of prejudice, and one of the cases which we cited in our brief is the consolidated data case, that says that the question whether the defendant was prejudiced by the amendment is no different from the question whether the issue introduced by the amendment was tried by consent. And certainly, so it's really a question of consent, and certainly there was no consent to try the issue in this case. Any further questions? Thank you. May it please the Court. Mick Rusine here on behalf of the Appellee Research Corporation. And I'd like to address some of the issues that the Court was examining with counsel. Do you mind starting with the question of extra contractual damages? It's hard for me to see how the district court, Coda Sui Sponte, imposed an extra contractual damage award when you hadn't pled it. Well, I think there's a couple things there. I think that if the what the Court, the Court has a whole long paragraph, almost a full page, explaining the notice that Westport received going back. Are you talking about the findings? In the findings. You drafted the findings. But your law firm did. Yes, but he read a lot of those that he came up with himself that were then incorporated. So why is it on your letterhead? Well, then we submitted them afterwards. He read findings at the end of the case. And then we incorporated. And some had been things we'd submitted, but some were off. But everything he said in his findings were exactly right in terms of the notice they got back as early as six months before. And I think one of the critical things is we move to continue the trial. And I guess it was in September. And we say, now, because up to this time, the claim hadn't been liquidated because it was still going on. Now there's been a settlement. Now there's going to be extra contractual. And we attach to the motion to continue the assignment of the bad faith action and say that RCT is going to take it over and it's going to be seeking bad faith and there's new damages and they're in excess of the policy, et cetera, et cetera. Then they come back and the Court reads their opposition to the motion to continue. It's very telling because they say, oh, research says it should be continued so that we can we, Westport, can do more discovery. We're fine. We've done enough. They don't speak for us. And acknowledged, you know, say things like RCT accepted the assignment knowing full well this trial was going to be now. They better be ready to try it. And we offered this continuance in case they wanted to do something else and for, frankly, to give me more time because I was to – I got the same amount of notice they did because I was RCT's lawyer. I came into this case. I hadn't done a deposition or anything and I got up to speed and tried it. But this train was coming down the track starting in April of that year and they knew about it. And then they filed something on the EVA trial saying this is the first time we've heard about it, which was simply false. But I think the Court was correct. The complaint in this action talks about indemnity. Now, indemnity is a dollar amount. And in this case, it happened to be in excess of the policy limits, ultimately. But they talk about extra-contractual like there's extra-contractual damages, and there really are not. I mean, they're extra-contractual since they're in excess of the contract, but they're not extra-contractual damages that the Court normally sees in bad faith cases, things like consequential damages, emotional distress damages, punitive damages, things like that. No, but I mean, in terms of first-party bad faith, it's common or even quintessential damage. You get a settlement and it's in excess of the policy limits. You get reimbursed for the settlement. Right. And once that settlement occurred, this part of the case, there was going to be a bad faith component tried. And the only question then is when and where. We had to add it at that time so it wouldn't be lost. And so it was up to the Court to decide when to do it. We filed a motion to continue, to give both sides more time. They opposed it. And the Court issued a ruling that says, basically, I think we can go forward on what we have. And then we went ahead and tried it. And the Court amended to conform to the evidence, which I don't even, like I said, I don't know that if he needed to do that, because I think you could make a strong argument, was already framed by the complaint. But in arguing against the amendment, Westport focuses on one of the two tracks under the rule. In fact, since the time of this case, the rule on amendments to the conformity of the evidence has actually been split into two sections to emphasize the distinction. One is the implied express or implied consent, which requires notice, and implied both those things occurred here. They make a big issue out that they filed a motion in limine, but that motion in limine was filed five days after they had signed on to a stipulation of all the documentary evidence and ten of those exhibits related solely to the bad faith case. But going on, what's critical, though, is the second part of that rule, which talks about the amendment as a result of failure to object to evidence and or, I'm sorry, amendment when there's an objection to evidence at the trial that injects new issues. And in that situation, the Court, they allow for liberal amendment. They specifically say if the Court, if the party thinks they're being harmed, they can ask for a continuance. Westport never did. They had that opportunity. And then they have to show substantial prejudice to get that. And they've never shown any substantial prejudice. Up through today, they've never said what we were going to do different. Who would we have called? What other evidence is out there? And that's the kind of offer of proof, I submit, you need to do in order to defeat an amendment like that. And they've never done that. Well, let me ask you the flip side of the question I asked your opponent. Now we're up here on appeal. They've asserted a new exclusion that was raised in the Reservation of Rights Letter but not really litigated at trial. Under the same logic, why shouldn't we allow them to pursue that? Well, there's a big difference. One was tried to the Court with notice to the parties. The contract exclusion was never tried. It was never brought to the Court's attention. How do you bring an issue to the Court's attention in absence of a pretrial statement? In your pleading, complaint or answer? In your trial brief? In your opening statement? In evidence you produce at trial? Or your closing statement? Well, he did mention in the opening statement when he read the Reservation of Rights Letter language. Right. But then that's during a historical section when he's talking about this is the history of the case. Later in the opening, it's very clear. He says here's what we're here to try, and there's three issues. And there's three issues that appear in all of the things I just mentioned, late notice, undue profit, and unreasonable fees. Those are the three things that he says we're going to try. And going back to the reference to the Reservation of Rights Letter, he refers to the very first Reservation of Rights, and he cites a number of defenses or exclusions that were in that letter. And that letter contained like eight or ten, you know, kitchen sink exclusions, wrong entity, fraud, crime, outside the policy period, et cetera. And none of those things got tried either. What got tried was late notice, profit, and reasonableness of fees, and they lost on all of those. And two of those they didn't even appeal from. But there's a big difference because one was never tried. Well, and you can tell that contract was never tried because the Court never made a ruling. And after the Court issued its rulings, they didn't come back in and say, Your Honor, we tried a case, and the Court must not have seen it being tried, and we need a ruling on it, and that is the damages arising out of contract exclusion. They never did that. Bear in mind also they put on a witness from Westport, Mr. Wasiniak, who was their only test — that was their only witness, and he testified the reason we denied the policy limit demand was because of late notice, profit advantage, and nothing else. So how can they come back in to begin with and claim it was anything else since their guy was there, and we tried it, and that's why bad faith was tried. He is their only witness on bad faith. He's the guy that got the — received the policy limit demand. He was the one who rejected it, and the reason it was rejected is we didn't think we were liable. There was no indemnity. We had no — there was no obligation to indemnify, so we didn't have to pay anything. We didn't — they didn't make a counteroffer. They said there's no coverage because late notice, profit. So that's the big difference between the two. These are not apples and apples. These are apples and oranges. One, there were six months of notice. It was something that was addressed. Witnesses put on, evidence admitted without objection. Whereas one, never brought up, no evidence, nothing in closing. After the court ruled, they didn't come back and say there's an issue here, still extant. Let's have a ruling on it. None of that occurred. Referring — I'll move on for a second here to the issue that we were talking about earlier, the profit advantage. There was some question about how much of the settlement was attributable to tort damages. There is evidence down below. Tim Record testified at length. I have a citation. It's a few pages on either side of 000319, which is in Volume 2 of the Westport Excerpts of Record. But Mr. Record, who was the person involved with negotiating this for our side, says that over 90 percent of the settlement value he attributed to the tort claims, and in particular the Big Count III conversion claim, that has nothing to do with contract. And he said — Counsel, I want you to walk me through the question as to why all of this isn't excluded under the contract provision. Which provision? I'd like you to address both of them, but I'd like you to start with the contract provision. All right. Why don't all of these claims arise out of a breach of contract? Now, I understand that we're claiming that somebody was engaging in fraudulent behavior, but the fraud was in connection with an obligation to pay money under a contract. No. It's a little bit different. Here's the situation, Your Honor. Count 1 is for breach of contract, and that is a clean breach of contract claim. And it says, look, we have a contract for the payment of royalties, and you've misinterpreted what percentage we're supposed to get, and you have for some time, and that's $20 million. And that needs to be recalculated, okay? Let's go on to one of the tort counts. Count 3 says, okay, subsequent to the contract, and having nothing to do with the contract, you stole intellectual property belonging to us. This intellectual property that constitutes what they call know-how or technical information that we developed after this contract, and you gave it to Bristol Myers, and that stuff that you provided to them has a value of $200 million to $400 million. And in terms of the profit stuff, this went to a lot of different people, not just to research to answer Judge Thomas's question. And the ultimate testimony of trial was they got zero of it. But even that's why you have to get beyond the complaint and say this is general damages. Well, what does that mean? That's the inquiry. That's the investigation that Westport needed to undertake and never did. Well, Westport's argument in that regard is that the restriction on the disclosure came out of the contract. How do you address that? In other words, the restriction on the disclosure of technical information. Well, it doesn't. It's not addressed in the contract at all. They said this was something that's not addressed in the contract. We developed after the contract. You got a hold of it and got it to Bristol Myers. There's another count about breach of fiduciary duty. And the 200 and 400 are separate and distinct from that 20 million. On these cases where they talk about torts and contract being alike, one could not exist without the other claim and that the losses overlap. This is tort claim seeking. Tort damage is separate and distinct from the contract and the contract damages. Likewise, there's breach of fiduciary duty count, suggesting that the contract is not covered by the contract. So I'm looking at paragraph 91, which is part of count 3, that JM has a right of possession of carboplate and technical information that developed. That right of possession is not a right of possession that arises out of contract? Right. It's not covered by the contract. It's not governed by a contract? It didn't exist at the time of the contract. And so that's why it is entirely separate and distinct. And there's other counts. The fraud count, the breach of fiduciary duty count suggests that we had a duty outside of the contract to negotiate better terms with Bristol Myers, better terms for them. And they didn't plead that as a contract because there's no contractual obligation to do that. You know, this is in a situation where you see a lot where a person really has a breach of fiduciary duty contract claim and they try and allege a bunch of other torts that are exactly the same so they can get punitives or this or that. These are separate and distinct, specific, factual-based, different damages, tort damages, well beyond what we would have ever received. And that's why it's separate and distinct from the contract. But to give the Court an idea, here's an – if you had a farm and you had a truck on it and you went to a used car salesman and said, I want you to sell this truck on the farm, go pick it up, you can get – I'll give you 20 percent. Later you go out to the farm, your truck's gone and your trailer's gone. And your neighbor says, yeah, that guy took your trailer, too, and gave it to his brother-in-law. Okay. You go talk to the guy and say, what's going on here? And he denies anything about the trailer, but he says, oh, I did sell your truck for a thousand bucks. Here's your 700. And you say, wait, I get 80 percent. And he says, well, there's a 10 percent storage charge. Okay. You've got two causes of action now. You have a breach of contract case for the consignment. You have a conversion case against them for the trailer. And that conversion case did not arise out of the consignment contract. That's how it's viewed. And that is totally separate and distinct. And I think one thing the Court needs to do, too, there's no cases right on point, fortunately or unfortunately, in this situation. There's things that bounce around. Westport cites all kinds of cases from arbitration context, from other things. There's nothing on point. So we're back to the old nuts and bolts contract interpretation. And under Arizona law, once you give coverage, to take it away, it's got to be very specific, everything's construed against you, et cetera, et cetera. Now, in the case at hand, what they are talking about, it's not even an exclusion. It's not an exclusion section. It's under definition of loss. And under that definition of loss, it has a list of types of damages, not claims. They're trying to argue that it's claims arising out of contract, but this is a definition of loss, and these damages are not covered. Punitives, tax, sanctions, liquidated damages, and damages, not claim, damages arising from breach of contract. Now, under Arizona law, that means if there's account pled for breach of contract and contractual damages are awarded, and that's not covered. It does not support an interpretation argued by Westport that if you're within a mile of a contract, there's an exclusion, because it doesn't exclude claims. It excludes damages. For it to be contractual damages, there needs to be a breach of contract claim. So it's a very narrow provision, really, and there's no basis for construing it as broadly as they're arguing. I had a friend of mine looking at this case from Texas. He said, Mick, Westport's view got accepted. If I went to the theater, bought a ticket to see the movie, paid my 10 bucks, and then I broke my leg, they'd exclude it because it rose out of the contract to show me the movie. I said, that's exactly right. And that's why that exclusion is not that broad, particularly the way it's written here and where it's contained in the policy, because it would – the way it's set up, it would defeat coverage in a lot of situations, and it would be – especially, you know, Research Corporation, it's a charitable foundation. Virtually everybody it comes in contact with or deals with in some fashion or another is based on a written document. And under their theory, there could be no claims between us because in some fashion or another, the relationship was based on or initiated in a contract, and that's simply not the law and clearly not the law of Arizona. Any further questions? Thank you for your argument. Thank you, Your Honor. Are you going to rebuttal? Mr. Ruzzi, I hope that we'll give you full time to make your – to make your rebuttal. I would like you to address the question I put to previous counsel out of paragraph 91, which is count three, the conversion claim. Yes, let me just get to that. And if you can explain how that arises out of a contract, Mr. Ruzzi. Paragraph 91? Paragraph 91, yes. Mr. Ruzzi's comment was that that would – that was not covered by the contract. It was just – it was conversion of technical information. Well, you have to go back to paragraph 37, which says, at all times, including in the JMRC contract, JM retained its rights to any and all carbo-platinum technical information. So the dispute between the parties was what does that mean? Well, it says including in the contract. It didn't say as governed by the contract or as the contract provides. It says including in the contract, JM retained its rights to any and all carbo-platinum technical information. That suggests that there might be something outside of contract that might have governed this as well. Well, it really came down, I think, to the question of the rights and obligations of the parties under the contract. And JM was asserting that, no, you don't have the right under the contract to license our carbo-platinum technical information. Where does it say that? Well, it's in the complaint. In the complaint? Yeah. Well, paragraph 37 says JM retained its rights to any and all carbo-platinum technical information. That's the paragraph 37. Right. It doesn't say it's governed by contract. It says including in a contract. Well, I mean, that's the way we read it.  This is a – No. It doesn't – it doesn't appear in count three, but I think you have to relate back to paragraph 37 to give the basis for why JM was asserting that Research Corporation was engaging in improper contact – conduct, because you had a contract that did give Research Corporation certain rights to license certain things, and the dispute was what did it have the right to license. JM said it didn't have the right to license that. Well, let's go to the next count, fraudulent concealment. Why is that governed by the contract? It says you didn't tell us about the technical information, and you misrepresented to us. Why is that a contractual claim? Well, if the previous count was a contractual claim, I think this one arises out of – is connected with the contractual claim, because it still goes to the issue of whether or not Research Corporation has an obligation to, under the contract, to even tell Johnson Matthey about that. It doesn't say anything about contractual obligations to inform, does it? Well, I think that this is certainly – It says it's a fraudulent misrepresentation about the information. Yes, but the issue, once again, is that did Research Corporation have an obligation under the contract to provide Johnson Matthey with that information, and that's an issue. Where does it say that in the complaint? Well, the entire complaint arises out of the contractual relationship, because the certain rights were given – you know, there was a dispute as to what rights Johnson Matthey had and what rights Research Corporation had. So – No, that certainly is – that's the way the complaint starts. But when you're talking about you misrepresented information that was supposed to be disclosed, should have been disclosed, and you plead it as a tort, where does it say that there's a contractual obligation to disclose the information? Well, I think in the context of the entire complaint, when everything arises out of the contract between the parties, I would just like one other point to make, if I could. Not only was the contract provision issue raised in opening statement, it was also raised in counsel's closing argument at page 548 of the excerpts of records. So I'd just like to, you know, make the Court aware of that. Mr. Abrams, before you leave, I wanted to ask you about the – assume we reached the bad faith damages. Yes. What's your best argument, if we consider that on the merits? On the merits? Yes. On the merits, I would say that there was – since there was no substantial evidence that Westport, you know, could have suspected that Research Corporation's exposure was in excess of the $2 million policy limits when it was being told and that it was really Research Corporation Technologies that was receiving almost all of the royalties that were at issue in the case. Could you explain that a little bit? You say Westport didn't know what? Westport had no reason to believe that, based upon what it knew, that Research Corporation was facing exposure in excess of the $2 million policy limits in light of the fact that – Didn't they know the complaint, what it asked for? Yes, but they were told that the bulk of the – bulk of the – you know, that Research Corporation's share of the allegedly improper payments was de minimis, that it was almost entirely the responsibility of Research – Is this the way your company goes about fulfilling its obligation to defend? This is not – this is not a defense issue. This is an issue of whether it had an obligation to pay the $2 million. All right. And it felt that Research Corporation was, you know, not exposed to a $2 million liability. That's not really the test in bad faith, though. The test is you had a policy limits demand and you elected not to pay policy limits. And so you put yourself at risk for any judgment in excess of policy limits, right? Well, I don't believe it's absolute liability. The issue is I – the test, as I understand it, is would a reasonable insurance company without any limit on its policy obligations have accepted a $2 million offer? And our position is that based on the evidence of which Westport was aware, even if its policy limits were $5 billion, you could not reasonably suspect that Research Corporation was exposed to anywhere near $2 million in this case. It was all Research Corporation technology's exposure. Thank you, Counsel. Thank you. The case that's argued will be submitted for decision.
judges: Noonan, Thomas, Bybee